Filed 1/28/26  P. v. Torres CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E083557 |
| v. | (Super.Ct.No. RIF2203627) |
| RAUL TORRES, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Rene Navarro, Judge. (Retired judge of the Santa Clara Super. Ct. assigned by the Chief Justice pursuant to art. VI, §6 of the Cal. Const.)  Affirmed.

Rex Adam Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Arlyn Escalante, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted Raul Torres of assault with force likely to cause great bodily injury, infliction of corporal injury on a former partner, criminal threats, and false imprisonment. (Pen. Code, §§ 236, 245, subd. (a)(4), 273.5, subd. (a), 422.) The victim was his former partner, C.M. Torres argues that the trial court erred by excluding evidence that C.M. abused Torres when he was 17 years old and she was an adult. We affirm.

BACKGROUND

C.M. began dating Torres in 2019, and they were together for several years. He never lived with her, but he stayed overnight at her trailer sometimes. In January 2022, C.M. went to visit her mother in Los Angeles. Torres did not want her to go and was angry. When she returned from the visit, she found her belongings on the ground outside the trailer. Torres had also changed the lock on the fence surrounding the trailer, so C.M. could not unlock the gate. She climbed under the gate to get inside. Torres was suspicious and accused her of being unfaithful. He demanded that she leave, even though it was her trailer. C.M.'s 17-year-old daughter, Jocelyn G., was in the trailer asleep. Jocelyn awoke to the sound of C.M. and Torres arguing. Torres sounded angry and was yelling. Jocelyn was scared and stayed in bed, but she heard the argument move outside.

C.M. loaded her belongings into her car and was prepared to leave, and Torres followed her outside. He grabbed her by the neck and choked her for five minutes "intermittently." She estimated that on a 10-point scale, with 10 being the greatest amount of force, the force that he used was a 10. She was dizzy, felt like vomiting, and

2

could not breathe. Her hearing was also impaired for a while after he choked her. Jocelyn then came out of the trailer and told Torres to leave C.M. alone, and Torres pushed Jocelyn. C.M. and Jocelyn got into C.M.'s car to flee, and they heard Torres fire a gun as they were leaving. C.M. had seen the gun on the bed earlier that night.

C.M. and Jocelyn fled to a friend's home. It was roughly 3:00 a.m. C.M. did not call the police immediately, because she was scared. Torres sent her a text message threatening to kill her if she came back, and he had threatened to kill her on other occasions. She called the police later that afternoon and requested to meet officers away from her trailer.

The responding officers had body-worn cameras that recorded their interview with C.M., and the People played the video for the jurors. C.M. said that she and Torres argued the night before because she had gone to visit her mother in Los Angeles. When she returned, Torres had changed the lock on her trailer. He told her to get her things and move out of the trailer. Torres choked her, threatened to kill her, and had a gun. She estimated that he choked her for five minutes using a force of seven on a 10-point scale. C.M. heard him fire his gun into the air once when she was getting her things and preparing to leave. She showed the officers text messages in which he threatened to kill her, called her a "'bitch,'" and told her, "'If you come back I'm gonna break your face.'"

A forensic nurse examined C.M. after she spoke with the officers. C.M. reported strangulation "in the form of choking." She told the nurse that Torres strangled her for five seconds using a force of 10 on a 10-point scale. She also said that Torres threatened

3

to kill her when he was strangling her and that he shot a gun into the air as she was leaving. Strangulation does not always result in visible injuries. Symptoms of strangulation include a hoarse voice, dizziness or lightheadedness, a headache, and shortness of breath. Victims might also have red spots on their eyes where the blood vessels have popped. According to the nurse's documentation of the exam, C.M. reported having many of the common symptoms of strangulation. She could not talk, breathe, or swallow during the strangulation. She also had rapid breathing, coughing, dizziness, lightheadedness, a headache, nausea, vomiting, and a hoarse voice after the strangulation. The nurse observed redness on one side of C.M.'s neck.

C.M. returned to her trailer hours after speaking to the police. Torres had changed the lock on the fence back to the old one, so she was able to enter. Torres was no longer there, and she did not intend to get back together with him. But they reconciled after he asked for her forgiveness. She loved him and hoped that he would change.

In May 2022, Torres again accused C.M. of being unfaithful and became upset with her. He punched her in the face, knocking her to the ground, and he continued to punch her in the face while she was on the ground. He hit her more than 10 times and choked her for five minutes intermittently. He used a force of 10 on a 10-point scale. He also pulled a gun, pointed it at her head, and threatened to kill her. She did not remember what made him stop the attack, but she got up and ran. When she got into her car, he hit the driver's side of the car with a stick and told her not to leave. C.M. has had problems with her memory since the incident, and she could not remember many details of it.

4

C.M. did not leave the trailer until Torres left the following morning. She went to the police department, where officers interviewed her. The interview was recorded by a body-worn camera, and the People played the video for the jurors. C.M. reported that Torres beat her, choked her, threw her on the ground, pulled a gun on her, and hit her car with a stick. He pointed the gun at her midsection. She estimated that he hit her 10 times and choked her for five minutes. One of the officers observed a petechia, or a burst blood vessel, in her eye. He also observed linear abrasions on her neck, bruising on her temple, and swelling of her nose.

C.M. was hospitalized overnight and had to wear a neck brace for two days. According to the nurse practitioner who examined C.M., strangulation can result in petechiae in the eyes. C.M. reported a hoarse voice, difficulty breathing and swallowing, nausea, and pain in her head and throat. She told the nurse that Torres strangled her using a force of four on a 10-point scale. The nurse opined that all of C.M.'s reported symptoms were "classic symptoms of strangulation."

An investigator with the sheriff's department testified as an expert on domestic violence and battered woman syndrome. The syndrome relates to "long-term patterns of abuse as opposed to a singular incident." The investigator explained that the goal of an abuser typically is to gain power and control over the victim. Emotional abuse is a common tactic in addition to physical abuse. Emotional abuse may include insulting the victim, falsely accusing them of being unfaithful, and isolating them or insisting that they spend all their time with the abuser. Victims do not always report immediately. They

may delay reporting because they hope that things will improve, the abuser has promised to stop the abuse, they love their abuser, or the abuser has threatened harm if they report. Victims may also recant their initial statements because they do not want to be responsible for sending a loved one to prison. In addition, a victim's memory may be affected by multiple incidents of strangulation or suffocation, preventing them from fully disclosing all the details of an incident. The likelihood of visible injuries from a nonfatal strangulation is low. In those cases, the investigator would have the strangulation victim examined for internal injuries.

The jury found Torres guilty of two counts of assault with force likely to cause great bodily injury, infliction of corporal injury on a former partner resulting in a traumatic condition, criminal threats, and false imprisonment. (Pen. Code, §§ 236, 245, subd. (a)(4), 273.5, subd. (a), 422.) The court suspended imposition of sentence and placed Torres on probation for three years. As a condition of probation, the court ordered Torres to serve 120 days in county jail through the work release program.

DISCUSSION

Torres contends that the trial court excluded evidence that C.M. "began abusing [Torres] when he was a minor." (Italics omitted.) He argues that the evidentiary ruling was an abuse of discretion and a violation of his Sixth Amendment right of confrontation. The argument lacks merit.

6

I.     *Additional background*

During cross-examination, defense counsel asked C.M. who A.R. was. The People objected, the court held an unreported sidebar conference, and it sustained the objection.

The court later memorialized the sidebar conference "pertaining to [the] relationship between the witness and the defendant's uncle." The court asked defense counsel to put his request on record, and counsel explained the claimed relevance of his question. According to counsel, A.R. is Torres's uncle (Uncle), and Uncle was in a relationship with C.M. for nearly 10 years. C.M. met Torres in 2012 when she was still in a relationship with Uncle. Torres was 17 years old in 2012. Counsel claimed that Torres and C.M. started a physical relationship in 2012 when Torres was a minor, contrary to C.M.'s testimony that their relationship started in 2019. Counsel further claimed that the relationship caused a family rift when it was discovered, and C.M. "used that as an opportunity to control and attempt to influence Mr. Torres at various points in time." Counsel argued that the evidence went to C.M.'s bias and credibility, because it contradicted her testimony about the length and nature of her relationship with Torres.

The People argued that the length of C.M.'s relationship with Torres was "fair game" and a proper subject of cross-examination. But they argued that evidence that C.M. had a relationship with Uncle was irrelevant, "designed to shame her," intended to make her seem promiscuous or unfaithful, and unduly prejudicial.

The court ruled that the probative value of the evidence was outweighed by the risk of undue prejudice and/or the potential to confuse or mislead the jury. The court observed that Uncle was not a proffered witness. It reasoned that the evidence was "not being offered with respect to an issue that will ultimately pro[ve] to be material to the party's case." The court explained that defense counsel could ask C.M. "anything with respect to their relationship, the length of it, what have you," but that counsel could not ask C.M. about Uncle.

After C.M. testified that she met Torres in 2019 and that they began their relationship that year, defense counsel asked: "Now, in fact, your relationship—your intimate relationship has gone back further than that, right?" C.M. replied: "No." Defense counsel asked if she was "sure" about that, and C.M. replied: "That I remember, yes." Counsel then showed her a photo collage of C.M. and Torres dated June 2017. At least two of the photos depicted them kissing, and they appeared to be hugging in others. C.M. confirmed that the photos fairly represented her and Torres at that time. She testified that she was not lying when she said that their relationship began in 2019; she did not remember them being together in 2017. Counsel also asked C.M. if she met Torres in 2012, and she said that she did not remember. Counsel then asked if she remembered that Torres was 17 years old in 2012, and she replied, "No." She agreed with counsel that she would have been roughly 35 years old in 2012.

Counsel also asked C.M. if she met Torres through a family member, and the court sustained the prosecutor's objection to the question. The court then held another

8

unreported sidebar conference, which was later memorialized. Defense counsel explained that he had a good-faith basis to believe that C.M. began an intimate relationship with Torres when he was 17 years old, making it a crime under Penal Code section 261.5. Counsel argued that C.M. groomed Torres and knew that her conduct was criminal and inappropriate. He asserted that "this not only is relevant but it goes to motive to fabricate."

The People argued that defense counsel was trying to offer both impeachment and character evidence. Torres had not given notice of the evidence prior to trial, and if he had, then the evidence would have been "402'd well in advance of trial." The People argued that there were no witnesses or documentary evidence substantiating the defense's claim that C.M. had committed a crime. In addition, the claimed crime would have occurred over 10 years ago, so it was remote. The People argued that the probative value of the evidence was outweighed by the risk of undue prejudice.

The court again explained that it was excluding the proffered evidence because "the probative value is substantially outweighed by the probability that [its] submission would . . . create undue prejudice and confuse the issues or mislead the jury."

II. *Exclusion of evidence regarding Uncle*

The primary purpose of the Sixth Amendment right of confrontation "'is to secure for the opponent the opportunity of cross-examination.'" (*Davis v. Alaska* (1974) 415 U.S. 308, 315-316, italics omitted.) "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." (*Id.* at p. 316.)

9

"[T]he cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness," including by "cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness." (*Ibid.*)

But the right to cross-examine a witness is not absolute. (*People v. Pearson* (2013) 56 Cal.4th 393, 454.) "'A trial court may restrict defense cross-examination of an adverse witness on the grounds stated in Evidence Code section 352.' [Citations.] Evidence Code section 352 gives the trial court discretion to 'exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'" (*People v. Villa* (2020) 55 Cal.App.5th 1042, 1051.) We review for abuse of discretion the court's ruling under Evidence Code section 352. (*People v. Johnson* (2019) 8 Cal.5th 475, 521.) We must uphold the court's ruling "'unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner.'" (*Ibid*.)

The court's routine application of Evidence Code section 352 generally does not implicate a defendant's constitutional rights. (*People v. Brown* (2003) 31 Cal.4th 518, 545.) "'[U]nless the defendant can show that the prohibited cross-examination would have produced "a significantly different impression of [the witnesses'] credibility" [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment.'" (*Id*. at pp. 545-546.)

10

The court did not err under either Evidence Code section 352 or the Sixth Amendment.  As a threshold matter, Torres does not accurately characterize the court's evidentiary ruling.  He claims that the court excluded evidence that C.M. abused him when he was minor or "began having a sexual relationship with [him] when he was a minor."  He asserts:  "[W]hat if C.M. had begun an intimate relationship with [him] years before the offenses, when he was 17 years old and she was in her mid-thirties and dating his uncle?  One might question who was jealous, who controlled and abused whom, and whether C.M.'s inconsistent stories indeed were a symptom of abuse, or instead of fabrication."

The court barred cross-examination of C.M. about Uncle.  But it did not bar cross-examination of C.M. regarding when she met Torres, when their relationship began, or whether they had an intimate relationship as early as 2012, when he was 17 years old.  Indeed, defense counsel was permitted to question C.M. on those topics.  She testified that their intimate relationship started in 2019, and she denied that their relationship began earlier than that.  Defense counsel then impeached her with photos of them in 2017, and C.M. acknowledged that she had been wrong but attributed it to her faulty memory.  Counsel also asked her if she met Torres in 2012 and if she recalled that he was 17 years old then, and she said that she did not remember either of those things.

Torres thus is incorrect that the court excluded all evidence or cross-examination on those topics.  He was permitted to cross-examine C.M., and he did not call any other witnesses (such as Uncle) to testify that C.M. and Torres began an intimate relationship

11

in 2012. Nor did he offer to produce documentary evidence that the relationship started then. But the court's ruling did not prohibit Torres from introducing evidence concerning the length of his relationship with C.M. or his age when the relationship started.

Rather, the ruling excluded evidence concerning C.M.'s claimed relationship with Uncle. But on this record, such evidence had little probative value, and the court did not abuse its discretion by excluding it. Even if C.M. had a relationship with Uncle and met Torres through Uncle, those circumstances alone do not give rise to a reasonable inference that C.M. became intimate with Torres when he was a minor. Nor do they give rise to a reasonable inference that C.M. was a jealous, controlling, or abusive partner years later. The claimed link between the excluded evidence (C.M.'s relationship with Uncle) and any motive to lie about the abuse by Torres was tenuous at best. Evidence of a claimed motive to fabricate "need not be admitted where the theory behind the alleged motive to fabricate is highly tenuous, speculative, conjectural or based on 'possibilities.'" (*People v. Johnson* (1984) 159 Cal.App.3d 163, 168.)

Given the limited probative value of the excluded evidence, the court did not abuse its discretion by concluding that the probative value was substantially outweighed by the danger of undue prejudice. For purposes of Evidence Code section 352, "'[p]rejudicial' means evidence '"that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues."'" (*People v. Johnson*, *supra*, 8 Cal.5th at p. 521.) Evidence that C.M. dated Uncle before Torres had the potential to bias the jury against her by portraying her as

promiscuous or inviting speculation that she was a "homewrecker" who would pit family members against one another. We cannot say that the court's decision was arbitrary or capricious, particularly when the claimed relationship with Uncle was irrelevant alone, and Torres offered no evidence that his relationship with C.M. began when he was a minor.

Moreover, the court's ruling did not violate Torres's right of confrontation, because he has not shown that the prohibited cross-examination would have produced a significantly different impression of C.M.'s credibility. Torres asserts that evidence that C.M. began a sexual relationship with him "when he was a minor and she was in her mid-thirties may have left the jury with a different impression of C.M.'s credibility." But there is no indication that Torres had any such evidence—he did not proffer evidence that their relationship began before 2017, when Torres was already an adult, and Torres was not prohibited from introducing such evidence. C.M. denied that the relationship started earlier than 2019. She said under cross-examination that she could not remember if she met Torres in 2012. Assuming that cross-examination regarding Uncle would have revealed that she met Torres as early as 2012, there is no reason to believe that she would have testified to an intimate relationship with Torres then. And her testimony regarding when they met and when their relationship began was already impeached by the photographic evidence of them in 2017, but even that evidence did not show that their relationship began when Torres was a minor.

In addition, Torres already had strong grounds for attacking C.M.'s credibility. There were numerous occasions during direct examination when C.M. could not testify to key details about Torres's attacks, and she then recalled them only after the People used her statements to officers to refresh her recollection. Indeed, she initially testified that she could not recall anything at all about the January 2022 incident. Her statements were also inconsistent as to several details. For instance, she testified at trial that Torres pointed a gun at her head during the May 2022 incident, but she told officers that he pointed the gun at her midsection. And her statements about how long he choked her and the amount of force he used were inconsistent. During closing argument, defense counsel repeatedly used C.M.'s memory lapses and inconsistent statements to argue that she was lying about many things, including "when their relationship began, how the assault happened, when the assault happened, [and] who was present for it." We cannot say that the jurors would have had a significantly different impression of her credibility if Torres had been able to show that she met him through Uncle. The court therefore did not violate Torres's constitutional right of confrontation by prohibiting cross-examination about Uncle.

The case on which Torres primarily relies, *People v. Castaneda-Prado* (2023) 94 Cal.App.5th 1260 (*Castaneda-Prado*), is inapposite. The defendant in that case was convicted of sexually abusing two children. (*Id.* at pp. 1266-1267.) At the preliminary hearing, one of the victims testified that she filed a declaration accusing the defendant of sexual abuse to help her mother obtain a "'U visa,' a type of visa that can provide legal

14

status for victims of certain crimes who assist in the investigation of those crimes.'" (*Id.* at pp. 1267, 1271-1272.) The trial court acknowledged the relevance of the U visa evidence to the defense "and at no point suggested that it was peripheral to the case" (*id.* at p. 1286), but it nevertheless excluded the evidence under Evidence Code section 352. (*Castaneda-Prado*, at p. 1267.)

*Castaneda-Prado* held that the trial court abused its discretion. (*Castaneda-Prado*, *supra*, 94 Cal.App.5th at p. 1290.) The appellate court concluded that the U visa evidence was highly probative as "bias evidence," namely, evidence that a witness has been offered inducements or expects benefits for their testimony. (*Id.* at p. 1285.) The court found that there was an adequate foundation for cross-examining the victim about any U visa, because "she *admitted* trying to help her mother obtain a U visa at the preliminary hearing. Nothing else was necessary to provide a good faith basis to cross-examine on the issue at trial." (*Id.* at p. 1286.) And there was not a substantial risk of undue prejudice or any of the other circumstances that would outweigh the significant probative value of the evidence under Evidence Code section 352. (*Castaneda-Prado*, at p. 1290.)

We disagree with Torres that this case "closely parallels" *Castaneda-Prado*. The probative value of the U visa evidence in *Castaneda-Prado* was clear and significant. The evidence tended to show that the victim expected a benefit for her testimony (the U visa) and therefore suggested a motive to lie in order to obtain that benefit. Torres's theory appears to be that if his relationship with C.M. began when he was a minor, then

15

C.M. was controlling and continued to control him years later, and falsely accusing him of abuse was a way of controlling and exerting power over him. But Torres was not prohibited from introducing evidence that his relationship with C.M. began when he was a minor, and the record contains no proffered evidence to that effect. The only evidence that was excluded concerned Uncle, and that evidence does not "tend[] reasonably to establish that [C.M.] has a motive to fabricate" the charged conduct in this case. (*Castaneda-Prado*, *supra*, 94 Cal.App.5th at p. 1285.) The further inferential steps from her alleged relationship with Uncle to her alleged control and power over Torres amount to pure speculation. "Evidence of a witness' conduct must *unequivocally* point to a possible motive to fabricate testimony before it is admissible." (*People v. Johnson*, *supra*, 159 Cal.App.3d at p. 168.) Otherwise, it is not relevant.

For all of these reasons, Torres fails to show that the trial court erred by restricting his cross-examination of C.M.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
                                                                                    J.

We concur:

McKINSTER
   Acting P. J.

FIELDS
   J.

16